# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

PLANNED PARENTHOOD )
GREATER MEMPHIS REGION and )
PLANNED PARENTHOOD OF MIDDLE )
AND EAST TENNESSEE, )
                      )
       Plaintiffs, )         No. 3:12-0139
                      )         JUDGE HAYNES
v. )
                      )
JOHN J. DREYZEHNER, Commissioner, )
Tennessee Department of Health, )
Defendant. )

## M E M O R A N D U M

Plaintiffs, Planned Parenthood Greater Memphis Region ("PPGMR") and Planned

Parenthood of Middle and East Tennessee ("PPMET"), filed this action under 42 U.S.C.§ 1983

against the Defendant John J. Dreyzehner, Commissioner of the Tennessee Department of Health

("TDOH"). Plaintiffs assert claims  for alleged violations of Plaintiffs' First Amendment rights

to associate and engage in constitutionally protected activities, as well as a violation of Plaintiffs'

rights under the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs' claims arise

from the revocations of their successful competitive bids for federal grants funded by the federal

Centers for Disease Control and Prevention ("CDC") for programs to prevent the transmission of

HIV/AIDS. PPGMR also received a CDC-funded grant for Syphilis Elimination. Plaintiffs have

historically been awarded such grants for these services. This bid process is administered by

Defendant. After notices of their successful bids for these federal funds in 2012, TDOH later

informed Plaintiffs of its shift to local governmental entities to provide the services under these

grants.

Plaintiffs allege that the actual reason for rejection of Plaintiffs' successful bids is to punish Planned Parenthood for its provision of or affiliation with abortion services that are not the purposes of these grants. Plaintiffs contend that the Defendant's decisions are unconstitutional penalties on Plaintiffs' First Amendment right to advocate for abortion services and also violates the Equal Protection Clause of the Fourteenth Amendment by singling Plaintiffs out for different treatment without a legitimate state interest.

Before the Court is Plaintiffs' motion for a preliminary injunction (Docket Entry No. 2) arguing, in essence: (1) that Plaintiffs, their patients, and their communities will suffer irreparable injury from TDOH's recent revocations of their 2012 grant awards due to their reduced services for HIV and syphilis prevention programs, including elimination of some programs and jobs; (2) that women, men, and teenagers in Tennessee will lose access to these public health services; and (3) that preliminary injunctive relief is necessary to protect their rights under the First and Fourteenth Amendments.

In opposition, the Defendant contends that TDOH has engaged in government speech balancing factors under applicable law favor the Defendant's decision.

For the reasons stated at the conclusion of the hearing on Plaintiffs' motion for preliminary injunction and as set forth below, the Court concludes that Plaintiffs' motion for preliminary injunction should be granted.

## A. Findings of Fact

### 1. The Federal Disease Prevention Grants

Under 42 U.S.C. § 247c, Congress established a system of grants for "prevention and control projects and programs" for sexually transmitted diseases ("STDs"). Congress vested the

Secretary of Health and Human Services ("DHHS") with the authority to award these grants. The Secretary delegated to the Center for Disease Control ("CDC"), an agency of DHHS, the administration of these grants. CDC utilizes the States, their political subdivisions and other entities to assist in the administration and award of these grants. In Tennessee, TDOH received grant funds and established HIV Prevention and Syphilis Elimination programs. For 2012, TDOH elected to award grants to five Regional Community Planning Groups ("RCPGs"). (Docket Entry No. 9-3, at 3). Grants for the HIV Prevention and Syphilis Elimination programs are allocated by the RCPGs through a competitive bidding process. United Way of Metropolitan Nashville ("UW Nashville") is the Lead Agency for Middle Tennessee. (Docket Entry No. 9-4 at 3). United Way of the Mid-South ("UW Mid-South") is the Lead Agency for Southwest Tennessee, that includes the Memphis region. (Docket Entry No. 9-3, at 2).

Each RCPG has a " Lead Agency" that issues Requests for Proposals ("RFPs") to organizations. To apply for grants, applicants must submit detailed proposals to an RCPG. A RCPG subcommittee reviews and scores the RFPs. Id. at 5; Docket Entry No. 9-4, at 6. The Lead Agency also analyzes the proposals for any improprieties or mistakes. The Lead Agency selects grantees, executes contracts for their services under the grant program, and forwards its selections to TDOH for approval. Approved agencies receive funding for the following calendar year. (Docket Entry No. 9-3, at 5; Docket Entry No. 9-4, at 6; Docket Entry No. 9-5, at 3). The Lead Agency receives and disburses grant funds to service providers approved by the RCPG. The Lead Agent also monitors subcontractors' invoices and performance. (Docket Entry No. 9-3; Docket Entry No. 9-4, at 5).

## 2. Plaintiffs' Grant Awards History

3

For the past decade, Plaintiffs were awarded CDC grants for the HIV Prevention program. For its most recent performance, in 2011, PPGMR tested over 3,800 individuals for HIV and conducted behavioral interventions with nearly 8,000 individuals. (Docket Entry No. 7, Chase Declaration at ¶ 6; Docket Entry No. 9-6 at 1). PPGMR has a highly successful HIV intervention program for homosexual men, a priority population, and developed a successful syphilis testing strategy for this same group. (Docket Entry No. 9-7, at 4). PPGMR collaborates with over 32 local agencies. (Docket Entry No. 9-7, at 4).

PPMET is one of only three HIV Prevention grantees in the Nashville region and is recognized for its high-quality programming and professional staff. (Docket Entry No. 8, Godwin Declaration at ¶ 6; Docket Entry No. 9-8). PPMET is the primary Nashville-area provider with expertise in working with high-risk youth, including teens who are incarcerated, in state custody, or attending alternative schools. (Docket Entry No. 9-8, at 3). In 2011, PPMET's grant proposal for its HIV Prevention program was to serve 1,250 individuals, but PPMET actually served 2,360. (Docket Entry No. 8, Godwin Declaration at ¶ 6). PPMET provides STD prevention education through relationships with over 100 organizations. (Docket Entry No. 9-8, at 1).

TDOH's evaluations of Plaintiffs' performance under these grants has been consistently positive. (Docket Entry No. 7, Chase Declaration at ¶ 13; Docket Entry No. 8, Godwin Declaration at ¶ 11). Between 2007 and 2011, three senior TDOH officials conducted at least four on-site inspections of PPGMR's HIV program and after each site evaluation, those TDOH officials did not propose any formal recommendations for changes.[1] Following a June 2011 site visit, TDOH's director for HIV Prevention Testing program commended PPGMR's "dedication

---

[1](Docket Entry No. 9, attachment thereto, Exhibits G, H, I and J).

4

to HIV prevention and the community" and stated that he "look[ed] forward to working with Planned Parenthood in the future." (Docket Entry No. 9-12).

In 2010 and 2011, UW Nashville conducted six site visits to evaluate PPMET's HIV program and each evaluation was positive. TDOH conducted its evaluation following a December 2010 site visit.[2] UW Nashville's most recent of these favorable evaluations was on December 14, 2011, two weeks before the State denied approval for PPMET's participation in the HIV Prevention program. (Docket Entry No. 9-18).

### 3. The 2012 CDC Grants

On May 27, 2011, the Southwest Tennessee RCPG and the Middle Tennessee RCPG issued RFPs for the 2012 HIV Prevention program. (Docket Entry No. 9-3, at 19; Docket Entry No. 9-4, at 19). On June 29, 2011, PPGMR submitted its detailed proposal for HIV program funding. (Docket Entry No. 7, Chase Declaration at ¶ 7; Docket Entry No. 9-6). On June 20, 2011, PPMET submitted its 41-page proposal for an HIV program funding bid. (Docket Entry No. 9-8).

By letter dated August 12, 2011, "[o]n behalf of the State", UW Mid-South notified PPGMR of its approval of PPGMR's 2012 HIV Prevention grant proposal of $73,000. (Docket Entry No. 9-20). August 24, 2011, UW Nashville notified PPMET of its approval of PPMET's 2012 HIV Prevention grant proposal of $41,500 "as approved by the Tennessee Department of Health, HIV/AIDS/STD Section, HIV Prevention Section." (Docket Entry No. 9-21). In September 2011, PPMET and UW Nashville executed a contract for these services. (Docket Entry No. 9-22). PPMET planned to serve at least another 1,100 individuals with its HIV

---

[2](Docket Entry No. 9, Exhibits K, L, M, N, O, P, and Q).

Prevention funds, reaching at least 500 through group level interventions and 600 through its outreach efforts. (Docket Entry No. 8, Godwin Declaration at ¶¶ 7, 13-15). None of these funds would have been used for any abortion-related services. (Docket Entry No.7, Chase Declaration at ¶ 14; Docket Entry No. 8, Godwin Declaration at ¶ 12).

At the State's request, PPGMR also applied for Syphilis Elimination grant funds for 2011 and 2012. During the course of 2011, a TDOH representative approached PPGMR, explaining that its participation was desirable because, among its other qualifications, it is the only subgrantee whose network of community partners includes an agency serving the gay community.[3] (Docket Entry No. 7, Chase Declaration at ¶ 10). By letter dated August 25, 2011, UW of the Mid- South informed PPGMR of its approval "[o]n behalf of the State"of PPMGR's proposal for Syphilis Elimination funding for 2011 and 2012. (Docket Entry No. 9-23). UW Mid-South and PPGMR subsequently executed a contract for grant funding for October 1, 2011 through December 31, 2011 for $32,000, with a renewal option for the 2012 calendar year. (Docket Entry No. 9-24, at 1, 6).  With these Syphilis Elimination funds, PPGMR planned to test and educate close to 2,000 individuals in the Memphis area. (Docket Entry No. 7, Chase Declaration at ¶ 20). With its 2012 HIV Prevention funds, PPGMR anticipated reaching 3,600 people with its HIV testing effmis and over 4,000 with its various education efforts. (Docket Entry No. 7, Chase Declaration at ¶ 7).

---

[3]Over the past several years, increases in syphilis among homosexual men have been reported in a number of cities. In these recent outbreaks, high rates ofHIV co-infection were documented, ranging from 20 percent to 70 percent. CDC, Syphilis & MSM (Men Who Have Sex With Men) -CDC Fact Sheet, available at http://www.cdc.gov/std/syphilis/STDFact-MSM-Syphilis.htm (last visited Feb. I, 2012).

### 4. The 2012 Revocations

Plaintiffs received 2012 HIV Prevention and Syphilis Elimination grants in August 2011.

Defendant John Dreyzehner became TDOH Commissioner in September 2011. By letter dated

December 28, 2011, Jeanece Seals, director of TDOH's HIV/STD Programs, informed UW Mid-

South that TDOH would not approve PPGMR as a government subcontractor in the CDC's HIV

Services grant program.

> We have reviewed the United Way of the Mid-South's proposed list of subcontractors submitted for the HIV Prevention Services grant contract and are unable to approve Planned Parenthood Greater Memphis Region as a subcontractor. Please notify us as soon as possible if United Way of the Mid-South will propose another subcontractor to provide these services. If another subcontractor is identified, please remember it must be selected through a competitive process and the documentation of the process must be maintained in accordance with Section D.16 of the grant contract.
>
> If you have any questions about reallocating the unobligated dollars, please contact Melissa Morrison at 615-532-8500, Thank you for your continued support of HIVC prevention programs.

(Docket Entry No. 9-25, Seals Letter).

A PPGMR official contacted a TDOH official about the December 28 letter and was told

that the State's refusal to approve Planned Parenthood also included any other State administered

grants. (Docket Entry No. 7, Chase Declaration, at.¶ 12). On January 9, 2012, after the 2012

grant funding was to commence, Niki Easley, UW Nashville's senior manager for HIV/AIDS

Initiatives, informed Jeff Teague, of PPMET that TDOH would not approve its participation in

the grant program. (Docket Entry No. 9-26). In a subsequent telephone call with PPMET, a

TDOH representative intimated that PPMET was unlikely to receive any grant funds during

Defendant's tenure as Commissioner. (Docket Entry No. 8, Godwin Declaration at ¶ 10).

Plaintiffs were the only service providers among the successful bidders whom TDOH did

not approve. In correspondence with PPGMR, a TDOH official confirmed this, stating that "[a]ll other contracts for HIV prevention were allowed to continue across the state, except for the two Planned Parenthood subcontracts." (Docket Entry No. 7, Chase Declaration at ¶ 12). This TDOH official observed, "I do not believe that experience and skill factored into the decision, as this information was not included as part of the contract that was sent for [C]onmissioner approval." Id. A TDOH representative subsequently informed the 2012 HIV Prevention grantees of continued HIV testing and counseling training from PPGMR, but that grant funds could not be used for this purpose and PGGMR had to charge a fee for such services. Id. at ¶¶ 16-17. TDOH reserved funds to reimburse the grantees for any fees paid to PPGMR. Id.

According to Melissa Morrison, TDOH's Director of the HIV/STD Prevention programs, she manages the HIV Prevention Program and the STD Prevention program, including Federal grants for both programs. (Docket Entry No. 28, Morrison Declaration at 1). After Dreyzehner's December 2011 decision not to approve PPGMR and PPMET, Jeanece Seals, Laurie Anderson, and Morrison sought replacement subgrantees and to reallocate the $73,000 in HIV Prevention funds in Memphis, the $41,500 in HIV Prevention funds in Nashville, and the $57,000 in Syphilis Elimination funds in Memphis that had been preliminarily allocated to PPGMR and PPMET. Id. at 2.

UW Memphis and UW Nashville assisted Morrison in issuing "mini" Requests For Proposals ("RFPs") to existing agencies that were chosen for funding in their other areas. "Mini" RFPs were circulated to Friends For Life ("FFL"), PEAS Inc. (Partnership to End Aids Status Inc.), Le Bonheur Community HIV Network, University of Memphis (Job Corp program), South Memphis Alliance, Children and Family Services, and St. Andrew AME Church. Id. Of those

8

seven (7), six (6) agencies applied.  Id.  PEAS was accepted to place 200 high-risk heterosexuals

through the VOICES program and 125 through the RESPECT program, as well as 60 gay men

through a new program, "Many Men, Many Voices."  Id. at 3.  PEAS would begin a Rapid

Testing program to serve 325 individuals.  Id. at 3.  PEAS's total grant was $61,000.  Id.  FFL

was awarded $12,000 to implement the Cuidate! Program to reach 25 high-risk Hispanic youth.

Id.  In Nashville, HIV Prevention grants were awarded to Street Works, Nashville CARES and

First Response Center.  A $41,500 grant was awarded to First Response Center to implement the

Street Smart DEBI Intervention to reach 200 youth.  Id.  First Response had memorandum of

understanding with high-risk youth in populations not previously provided HIV evidence-based

interventions.  Id.  These sub-contracts were to begin on February 1, 2012.  Id. at 4.

FFL in Memphis received the $57,000 in Syphilis Elimination through the CDC grant

that had been designated for PPGMR.  Id.  FFL will increase its media campaign in Memphis for

African-American men who have sex with men and will test an additional 500 men.  Id.

HIV Prevention program and Syphilis Elimination program grants submit invoices on a

monthly basis to the Lead Agency, UW, that submits its monthly invoices to TDOH.  Aside from

CDC HIV Prevention grants, TDOH provides approximately 4,000 HIV Prevention rapid test kits

annually to PPGMR for both clinical and outreach testing, and plans to continue to do so.  Id.

Each kit costs the Department of Health approximately $10.50.  Id. at 4-5.  Yet, TDOH does not

provide funding for testing personnel through its CDC HIV Prevention grants, to Planned

Parenthood nor to any other recipient.  Id. at 5.

According to Morrison, "PPGMR conducts at least four (4) [HIV tetsing] trainings per

year in Memphis, and is the only certified master trainer in Memphis capable of doing such

extensive training." Id. After PPGMR's non-approval as a subgrantee in 2012, the $100 fee per person that PPGMR now intends to charge for its HIV Testing training may be paid from UW Memphis's $6,000 training fund. Id. Morrison denies telling Ms. Godwin that "it would not be worth PPMET's time and resources to apply for future grant funding while Commissioner Dreyzehner is in office." Id. Morrison states that "I told them that was up to them, given the political climate." Id.

### 5. Political and Legislative History[4]

Plaintiffs cite now Governor Haslam's 2010 campaign platform pledge to prevent public monies from being directed to Planned Parenthood.[5] According to Plaintiffs, in 2011, with Governor Haslam's support, the Tennessee General Assembly amended the appropriations bill upon request of State Senator Stacey Campfield. Senator Campfield's amendment limited Title X grant funds to govenment health agencies, thereby excluding private, not-for-profit organizations, such as Planned Parenthood. With the adoption of his amendment and enactment of the appropriation bill for fiscal year 2012, Senator Campfield stated: "We had to kiss a lot of ugly

---

[4]For the relevance of this section, see Planned Parenthood of Kansas and Mid-Missouri v. Brownback, 799 F. Supp.2d 1218, 1229-30 (D. Kan. 2011):

> Given the obvious conflict between state and federal law, the court would be remiss in ignoring the legislative history cited by the plaintiff. Further, it is important to stress that plaintiff's claim includes the allegation that Section 107(l) was passed for an improper purpose, that of punishing Planned Parenthood for its association with abortion. The court accordingly considers the contemporaneous floor statements of the author of the challenged legislation as highly probative of legislative intent.

[5]Tennessee Governor's Race, Viewpoint, *Memphis Commercial Appeal*, Apr. 11, 2010, available at 2010 WLNR 7565407 also available at http://services.tennessean.com/news.aspx/2010-tn-governor-race (follow "Bill Haslam" hyperlink; then follow "Social Issues" hyperlink) (last visited Feb. 1, 2012).

Case 3:12-cv-00139   Document 29   Filed 02/17/12   Page 10 of 23 PageID #: 417

girls at the prom, but we took the pretty one home .... [W]e got what I was looking for, which was defunding Planned Parenthood. . . ." (Docket Entry No. 9-27, at 2).[6]

Plaintiffs also cite Ron Ramsey, Tennessee's Lieutenant Governor, who issued a June 10, 2011 press release praising "the work of Gov. Bill Haslam and the Tennessee Department of Health for moving to administratively defund Planned Parenthood."[7] Ramsey also asserted that "Planned Parenthood is the largest abortion provider in the country." Ramsey also cited that Davidson County was ending its Title X contract with PPMET, and that Shelby County expected to begin closure of its similar contract with PPGMR. Ramsey stated: "It has always been the ambition of Republicans in the legislature to defund this organization. I was proud to lead the charge to turn over famiiy planning services to the county health departments effectively defunding the organization in 93 out of 95 counties. I'd like to praise the Governor for working to completely turn off the spigot of taxpayer funds to Planned Parenthood." (Docket Entry No. 9-28).

According to Plaintiffs, similar Congressional efforts are underway to defund Planned Parenthood for its association with and provision of abortion services. On February 17, 2011, United States Representative Mike Pence proposed an amendment to a federal appropriations bill that the House of Representative adopted that singled out Planned Parenthood and its 102 putative affiliates from receiving federal funds for any purpose. Representative Pence explained

---

[6]Tom Humphrey, Budget bill mix-up in Nashville remains unresolved, Knoxville News_Sentinel, June 12, 2011, available at 2011 WLNR 11711216, also available at http://blogs.knoxnews.com/humphrey/2011/06/with-planned-parenthood-defund.html (Docket Entry No. 9-27).

[7]Tennessee Lt. Governor Ramsey, http://ltgov. tn.gov/2011/06/ (follow "Lt. Governor Ramsey praises Governor . . ." hyperlink) (Docket Entry No. 9-28).

his amendment as necessary because Planned Parenthood "provide[s] and promote[s] abortion." 157 Cong. Rec. H1081-01, 2011 WL 556799, at *H1157 (statement of Rep. Pence). In addition to Tennessee, Plaintiffs cite efforts in 2011 in Kansas, Indiana, New Hampshire, North Carolina, Texas, and Wisconsin to defund abortion providers and Planned Parenthood specifically.

## B. Conclusions of Law

The factors on whether to grant a preliminary injunction are as follows: (1) the movant's likelihood of success on the merits, (2) the likelihood that the movant would suffer irreparable harm in the absence of preliminary relief, (3) whether issuance of an injunction would cause substantial harm to others, and (4) whether an injunction is in the public interest. <u>Hunter v. Hamilton County. Bd. of Elections</u>, 635 F.3d 219,233 (6th Cir. 2011). These factors are to be balanced and do not receive rigid application or an assignment of equal weight. <u>In re Eagle-Pilcher Indus., Inc.</u>, 963 F.2d 855, 859 (6th Cir.1992); <u>Dayton Area Visually Impaired Persons, Inc. v. Fischer</u>, 70 F.3d 1474, 1480 (6th Cir. 1995) ("Those four considerations are, however, 'factors to be balanced, not prerequisites that must be met. Accordingly, the degree of likelihood of success required may depend on the strength of the other factors.'") (citation omitted). For the likelihood of success factor, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." <u>Six Clinics Holding Corp., II v. Cafcomp Sys.</u>, 119 F.3d 393, 402 (6th Cir. 1997) (affirming grant of preliminary injunction) (citation omitted). The other factors are addressed in the context of the law applicable to Plaintiffs' claims.

## 1. Likelihood of Success on the Merits

12

### a. The First Amendment Claims

Under the First Amendment, "[a] State may not condition public employment on an employee's exercise of his or her First Amendment rights." O'Hare Truck Service , Inc.v. City of Northlake, 518 U.S. 712, 717 (1996). In O'Hare, where a government contractor "was targeted with a specific demand for political support" and whose refusal of that demand resulted in his removal as a City contractor, the Supreme Court extended this First Amendmnt protection to the government contractor, stating: "We see nothing to distinguish this from the coercion exercised in our other unconstitutional conditions cases." Id. at 721. In a companion decision, Bd. of County. Comm'rs v. Umbehr, 518 U.S. 668, 674-75, 680 (1996), involving the government cancellation of an independent contractor's a pre-existing commercial contract as punishment for the contractor's exercise of constitutional rights, the Supreme Court stated: "The First Amendment permits neither the firing of janitors nor the discriminatory pricing of state lottery tickets based on the government's disagreement with certain political expression." Id. at 680.

The rationale is that "if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited ... allow[ing] the government to 'produce a result which [it] could not command directly.'" Perry v. Sindermann, 408 U.S. 593, 597 (1972) (quoting Speiser v. Randall, 357 U.S. 513, 526 (1958)); see also Nat 'l Endowment for the Arts v. Finley, 524 U.S. 569, 587 (1998) ("If the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints, then we would confront a different case."); Lane v. City of Lafollette, 490 F.3d 410, 419 (6th Cir. 2007) ("the denial of a government benefit on account of a person's political beliefs is in effect a penalty for holding those beliefs." (citing

13

Perry, 408 U.S. at 597).

In Rust v. Sullivan, 500 U.S. 173, 196 (1991), where the plaintiffs asserted their First Amendment right "to engage in abortion advocacy and counseling," the Supreme Court explained that "our 'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally approved program." Id. at 197 (emphasis in original). In Rust, the Supreme Court recognized that although the government can elect not to subsidize the abortion or advocacy for access to abortion as a form of government speech, the government cannot disqualify an otherwise eligible recipient of public funds based on that recipient's conduct outside of the government program.  Id. at 198.

Circuit and district courts have held  in the context of abortion advocacy groups, that the First Amendment rights of expression, association and advocacy are violated where States target abortion groups for disqualification from public funding. Planned Parenthood of Mid-Mo. & E. Kan., Inc. v. Dempsey, 167 F.3d 458, 462 (8th Cir. 1999) ("Legislation that simply dictates the proper scope of government-funded programs is constitutional, while legislation that restricts protected grantee activities outside government programs is unconstitutional .... "); Planned Parenthood of Cent. N.C. v. Cansler, 804 F. Supp.2d 482 (M.D.N.C. 2011) (North Carolina prohibition on Planned Parenthood receiving Title X as well as certain state funds constituted impermissible penalty).

In a recent decision, the District Court for North Carolina observed that "[W]hile a state may completely choose not to fund abortion services, the state may not bar an entity from the

14

benefit of funding for which it would otherwise be eligible based on the entity's participation in unrelated 'legal and constitutionally-protected conduct.'" Cansler, 804 F. Supp. 2d at 494 (quoting Planned Parenthood of Kan. & Mid-Mo. v. Brownback, 799 F. Supp. 2d 1218, 1234 (D. Kan. 2011) (granting an injunction against a Kansas law as an impermissible penalty on exercise of constitutional rights where "the circumstances surrounding the passage of [the defunding law] convince the court that the purpose of the statute was to single out , punish, and exclude Planned parenthood, the only historical Kansas subgrantee which provides and associates with a provider of abortion services from receiving any further Title X grants.")).

The Court concludes from the proof here that based upon Plaintiffs' historical experiences in providing these services under State awarded grants for almost a decade and the State's agent's provisional awards of Title X grants to Plaintiffs for 2012 grants, the Defendant's rejection of Plaintiffs was based upon their First Amendment activity for advocating abortion. The Defendant's disapproval of Plaintiffs' grant awards is to penalize Plaintiffs for the exercise of their constitutionally-protected right of affiliation with, and/or advocacy for access to abortion services. Because this penalty on constitutionally-protected activity violates Plaintiffs' rights under the First Amendment, Plaintiffs are substantially likely to succeed on the merits of these claims.

Defendant argues that the Court must engage in a balancing approach under O'Hare and under the balancing approach the Defendant properly exercised his discretion in these grant award decisions. To be sure, O'Hare cites the balancing approach, but also recognized an exception that is applicable here.

Our cases call for a different, though related, inquiry where a government

15

employer takes adverse action on account of an employee or service provider's right of free speech. There, we apply the balancing test from <u>Pickering v. Board of Ed. of Township High School Dist. 205</u>, <u>Will Cty.</u>, <u>supra</u>. See <u>generally</u> <u>Board of Comm'rs, Wabaunsee Cty. v. Umbehr</u>, 518 U.S., at 675-678, 116 S.Ct., at 2347-2349. **<u>Elrod</u> and <u>Branti</u> involved instances where the raw test of political affiliation sufficed to show a constitutional violation, without the necessity of an inquiry more detailed than asking whether the requirement was appropriate for the employment in question. There is an advantage in so confining the inquiry where political affiliation alone is concerned, for one's beliefs and allegiances ought not to be subject to probing or testing by the government**. It is true, on the other hand, as we stated at the outset of our opinion, <u>supra</u>, at 2355, that the inquiry is whether the affiliation requirement is a reasonable one, so it is inevitable that some case-by-case adjudication will be required even where political affiliation is the test the government has imposed. A reasonableness analysis will also accommodate those many cases, perhaps including the one before us, where specific instances of the employee's speech or expression, which require balancing in the <u>Pickering</u> context, are intermixed with a political affiliation requirement. In those cases, the balancing <u>Pickering</u> mandates will be inevitable. This case-by-case process will allow the courts to consider the necessity of according to the government the discretion it requires in the administration and awarding of contracts over the whole range of public works and the delivery of governmental services.

<u>O'Hare</u>, 518 U.S. at 719-20 (emphasis added).

Based upon the findings above, the Court concludes, as have other courts in similar circumstances, that here the State engaged in an exercise of "raw" political power to penalize Plaintiffs for their activities and advocacy unrelated to these federal grants and programs. <u>O'Hare</u>, 518 U.S. at 719. To do so obviates the necessity of any balancing approach.

Assuming the balancing approach is appropriate under the facts here, the Court considers the relevant factors identified in <u>O'Hare</u>.

Cities and other governmental entities make a wide range of decisions in the course of contracting for goods and services. The Constitution accords government officials a large measure of freedom as they exercise the discretion inherent in making these decisions. <u>Board of Comm'rs, Wabaunsee Cty. v. Umbehr</u>, 518 U.S., at 674, 116 S.Ct., at 2346. **Interests of economy may lead a governmental entity to retain existing contractors or terminate them in favor**

16

of new ones without the costs and complexities of competitive bidding. A
government official might offer a satisfactory justification, unrelated to the
suppression of speech or associational rights, for either course of action. The
first may allow the government to maintain stability, reward good
performance, deal with known and reliable persons, or ensure the
uninterrupted supply of goods or services; the second may help to stimulate
competition, encourage experimentation with new contractors, or avoid the
appearance of favoritism. These are choices and policy considerations that
ought to remain open to government officials when deciding to contract with
some firms and not others, provided of course the asserted justifications are
not the pretext for some improper practice. In view of the large number of
legitimate reasons why a contracting decision might be made, fending off
baseless First Amendment lawsuits should not consume scarce government
resources. If the government terminates its affiliation with a service provider
for reasons unrelated to political association, Mt. Healthy City Bd. of Ed. v.
Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), as, for
example, **where the provider is unreliable, or if the service provider's political
"affiliation is an appropriate requirement for the effective performance"** of
the task in question, Branti v. Finkel, 445 U.S., at 518, 100 S.Ct., at 1295, there
will be no First Amendment violation.

Id. at 724-25.

Here, Seals's letter setting aside the provisional awards of Title X grants in 2012 to
Plaintiffs did not state **any** reason for the Defendant's decision. The undisputed facts are that
Plaintiffs' past performances with Title X grant awards exceeded expectations. TDOH's multiple
on-site evaluations of Plaintiffs did not reveal any deficiencies worth mentioning. Allowing the
grant awards to Plaintiffs would have continued good and reliable provision of these services and
would ensure the uninterrupted provision of critical health care services. PPMET and PPGMR
each offer programs that cannot be replicated by other providers in their areas, and each has a
unique network of program partners.  With the revocation of the provisional 2012 grants to
Plaintiffs, the Lead Agents in East, Middle and West Tennessee regions had to repeat the
competitive bid process anew.

17

Significantly, the Defendant has not disavowed the statements of Tennessee elected officials that the basis for the actions in defunding Planned Parenthood was for Plaintiffs' abortion services and advocacy. The Title X grants at issue are for HIV/AIDS and Syphillis elimination programs and do not fund nor authorize abortion services. 42 U.S.C. § 300a-6. To the extent Seals relied upon the Tennessee appropriation bill, Title X expressly allows nonprofit entities and organizations to apply for Title X grants. 42 U.S.C. § 300(a); 42 C.F.R. §§ 59.3 and 59.5. Several courts have held that State law or policy that precludes private and not-for-profit entities from competing for Title X grants, violates the Supremacy Clause. See Cansler, 804 F. Supp.2d at 491 ("with respect to the Supremacy Clause . . . the overwhelming weight of authority supports the conclusion that [the defunding law] would be preempted by Title X.")(citations omitted).

Applying the balancing test advanced by the Defendant underscores the Court's conclusion that the revocations of Plaintiffs' provisional 2012 Title X grants were not to advance a State interest, but to punish Plaintiffs for the exercise of their protected First Amendment right.

### b. Plaintiffs' Equal Protection Claims

The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). The Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); see also Sioux City Bridge Co. v. Dakota Cnty., 260 U.S. 441, 445 (1923) ("The purpose of the equal

18

protection clause of the Fourteenth Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.") (quoting Sunday Lake Iron Co. v. Wakefield Tp., 247 U.S. 350, 352 (1918))). As the Supreme Court has explained, "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." U.S. Dep't of Agric. v. Moreno, 413 U.S. 528, 534 (1973); see also Bower v. Vill. of Mount Sterling, 44 Fed. Appx. 670, 675-78 (6th Cir. 2002) (denial of appointment to village police chief in retaliation for plaintiffs parents' political views states Equal Protection claim).

Where, as here, the State interferes with a person's exercise of fundamental constitutional rights, the Equal Protection Clause applies the strict scrutiny standard. See Mass. Bd. of Ret. v. Murgia, 427 U.S. 307,312 & n.3 (1976) (noting that First Amendment rights and the right to an abortion are "fundamental rights" and that classifications burdening those rights are reviewed under strict scrutiny); Dubay v. Wells, 506 F.3d 422, 429 (6th Cir. 2007) ("[C]lassifications affecting fundamental rights 'are given the most exacting scrutiny.' Under strict scrutiny, a regulation infringing upon a fundamental right will only be upheld if it is narrowly tailored to serve a compelling state interest." (internal citation omitted)).

Based upon the Court's findings discussed supra at 17-18, the State lacked any legitimate reason for distinguishing Planned Parenthood from the dozen or so similarly-situated service providers whose contracts were approved. The Defendant has failed to offer any rationale at all for its decision to terminate Planned Parenthood's contracts. Plaintiffs each have received grant

19

money for their HIV Prevention programs for over ten years with commendable performance in providing grant-related services. Plaintiffs competed successfully in a bid process that was administered by an experienced and disinterested third party. At the time of the revocations, the Defendant reportedly lacked even the most basic information necessary to evaluate substantively Plaintiffs' current grant proposals. (Docket Entry No. 7, Chase Declaration at ¶ 12).

At this stage of the proceedings, the proof is clear and convincing that the Defendant acted with political motivation to defund Planned Parenthood from a federal grant program funded by the federal government. The "desire to harm a politically unpopular group" does not constitute a legitimate governmental interest. Moreno, 413 U.S. at 534. Tennessee's concerted effort to defund Plaintiffs is neither "narrow enough in scope [nor] grounded in a sufficient factual context for [the court] to ascertain some relation between the classification and the purpose it serve[s]." romer v. Evans, 517 U.S. 620, 632-33 (1996). Other courts have reached similar conclusions. See Planned Parenthood of Minn. v. Minnesota, 612 F.2d 359, 361 (8th Cir. 1980) ("Planned Parenthood's unpopularity in and of itself and without reference to some independent considerations in the public interest" could not justify a statute forbidding the state health commissioner from issuing grants to nonprofit corporations that perform abortions); Cansler, 804 F. Supp.2d at 498 (holding that plaintiff Planned Parenthood showed a likelihood of success on equal protection claim because there was no rational basis for statute barring funding to Planned Parenthood other than "penalizing Planned Parenthood and its affiliates"); Planned Parenthood of Kan. v. City of Wichita, 729 F. Supp. 1282, 1289-91 (D. Kan. 1990) (law banning contract with Planned Parenthood violates equal protection where it was "deprived of the benefit of continued access to Title X funding simply because of the reputation and unpopularity of

Planned Parenthood"). Here, the "sheer breadth [of the State's Action] is so discontinuous with the reasons offered for it that [it] seems inexplicable by anything but animus toward the class it affects." <u>Romer</u>, 517 U.S. at 632.

For these reasons, the court concludes that Plaintiffs have well demonstrated a likelihood of success on their Equal Protection claim.

### 2. Irreparable Injury

As a matter of law, given that Plaintiffs have shown a likelihood of success on their First Amendment claim "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976) (internal quotation marks omitted); see <u>Planned Parenthood Ass 'n of Cincinnati v. City of Cincinnati</u>, 822 F.2d 1390, 1400 (6th Cir. 1987) (finding irreparable injury where plaintiff has shown substantial likelihood of success on merits of constitutional challenge to abortion regulation).

As a matter of fact, the proof is that given Plaintiffs' lengthy history of receiving these grants, Plaintiffs' conduct of its operations will be disrupted with the prospect of cuts in programming, community contacts and employees. PPGMR will be unable to offer HIV programs for teenagers and its VOICES behavioral intervention program with 200 clients, would have to be reduced to 50 clients. PPGMR's RESPECT one-on-one counseling services to 150 persons would be eliminated. (Docket Entry No.7, Chase Declaration at ¶ 16). In the absence of an injunction, Plaintiffs' patients and communities throughout the State will suffer the loss of Plaintiffs' expert services for serious health problems. Defendant's abrupt decision has already forced their Local Agents to commence the detailed competitive process. PPGMR closed two of the four outreach sites, and testing services will require a fee. One aspect of PPGMR's syphilis

21

testing has been eliminated entirely. Id. at ¶ 20.

PPMET must reduce its VOICES behavioral intervention to a limited number of clients. PPMET's Promoting Healthy Decisions ("PHD") at area high schools will have to be limited to far fewer students than the 584 individuals in 2011. PPMET has to eliminate its Street Smart program and will now have to charge for its programs, such as, PPMET's HIV Prevention programs to community-based organizations and schools that was free to at-risk youth and other young people. PPMET expects layoffs of one or two education positions. The loss of services to targeted youth would be particularly damaging to the community as new HIV infections among 15 to 24 year olds in Tennessee has doubled in the past five years.[8]

These types of factual showings have been deemed sufficient to warrant injunctive relief. See Planned Parenthood of Kansas, 799 F. Supp.2d at 1235-36; Neb. Health Care Ass 'n, Inc. v. Dunning, 578 F. Supp. 543, 545 (D. Neb. 1983) (holding that a reduction in Medicaid benefits constituted a genuine threat of irreparable harm "because the reduction in payments . . . is likely to result in a reduction of the quality of services to patients"). Thus, the Court concludes that the Plaintiffs have made an ample showing of irreparable harm.

### 3. Harm to Others

Given the findings on the irreparable injury factor, supra, the Court concludes that the balance of harms clearly favors Plaintiffs. Absent an injunction, Plaintiffs' clientele and communities will lose important public health services on matters of grave public health concerns. Plaintiffs will be deprived of their constitutional rights and there is not any harm to

---

[8]Toileman, Middle TN Doctors, Researchers, Activists Pursue the End of AIDS, The Tennessean, Jan. 9, 2012, available at http://www. tennessean.com/article/20 1201 09/NEWS07 /301 090020/Middle-TN-doctorsresearchers- acti vists-pursue-end-AIDS.

TDOH in preventing these violations of Plaintiffs' constitutional rights. See, e.g., Planned Parenthood Ass'n of Cincinnati, 822 F.2d at 1400 (holding that there was no substantial harm in preventing city from enforcing ordinance that was likely to be found unconstitutional, as the state has no valid interest in enforcing an unconstitutional ordinance).

### 4. Public Interest

Given the Court's conclusions on the Defendant's violations of Plaintiffs' First Amendment rights and Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment, the Court notes on the public interest factor that "it is always in the public interest to prevent the violation of a party's constitutional rights." G &V Lounge Inc. v. Mich. Liquor Control Comm. 23 F.3d 1071,1079 (6th Cir.1994).

### C. Conclusion

For the foregoing reasons, this Court concludes that Plaintiffs' motion for preliminary injunction (Docket Entry No. 2) should be granted.

An appropriate Order is filed herewith.

**ENTERED** this the _17_ day of February, 2012.

William J. Haynes, Jr.
United States District Judge

23