## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

PLANNED PARENTHOOD            )
GREATER MEMPHIS REGION and    )
PLANNED PARENTHOOD OF MIDDLE  )
AND EAST TENNESSEE,           )
                              )
    Plaintiff,                )    No. 3:12-cv-00139
                              )    Chief Judge Haynes
v.                            )
                              )
JOHN J. DREYZEHNER, Commissioner, )
Tennessee Department of Health,   )
                              )
    Defendant.                )
                              )

## M E M O R A N D U M

Plaintiffs, Planned Parenthood Greater Memphis Region ("PPGMR") and Planned Parenthood of Middle and East Tennessee ("PPMET"), filed this action under 42 U.S.C. § 1983 against Defendant John J. Dreyzehner, Commissioner of the Tennessee Department of Health ("TDOH"). Plaintiffs assert claims for alleged violations of Plaintiffs' First Amendment rights to associate and engage in constitutionally protected activities, as well as violation of Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs' claims arise from the revocations of their successful competitive bids for federal grants funded by the federal Centers for Disease Control and Prevention ("CDC") for programs to prevent the transmission of HIV/AIDS. PPGMR also received a CDC-funded grant for Syphilis Elimination. Plaintiffs have historically been awarded such grants for these services. This bid process is administered by the Defendant. After notices of their successful bids for these federal funds in 2012, TDOH later informed Plaintiffs

of its shift to local government entities to provide the services under these grants.

Plaintiffs allege that the actual reason for rejection of Plaintiffs' successful bids is to punish Planned Parenthood for its provision of or affiliation with abortion services that are not the purposes of these grants. Plaintiffs contend that the Defendant's decisions are unconstitutional penalties on Plaintiffs' exercise of their First Amendment right to advocate for abortion services and also violates the Equal Protection Clause of the Fourteenth Amendment by singling Plaintiffs out for different treatment without a legitimate state interest. As discussed below, in earlier proceedings, the Court granted Plaintiffs' motion for a preliminary injunction. (Docket Entry Nos. 29, 30).

Before the Court is Plaintiffs' motion for permanent injunction (Docket Entry No. 53), contending, in sum, that the parties entered into a binding settlement agreement for a permanent injunction against Defendant's challenged actions. Plaintiffs also cited the Defendant's refusal to recognize that parties' agreement.

In response, Defendant asserts settlement negotiations were predicated upon the agreement on Plaintiffs' substantive claims for permanent injunctive relief **and** Plaintiffs' claim for attorneys' fees and costs. Defendant contends that because the parties did not agree on attorneys' fees, there was not any settlement agreement. Further, Defendant asserts a change in the law that invalidates any prior settlement discussions.

For the reasons set forth below, the Court concludes that the parties created an enforceable and binding agreement for the entry of a permanent injunction that resolves all legal claims in this action. As a matter of law, the agreement on the permanent injunction entitled the Plaintiffs to be considered for an award of attorneys' fees. Under Sixth Circuit law, the issue of attorneys' fees is a collateral matter that does not preclude the creation of an enforceable agreement. In addition, the

2

Defendant agreed to negotiate the issue of attorney fees, but in fact, did not do so. The Defendant's reliance on a Fifth Circuit decision is misplaced as that decision actually supports the enforcement of the settlement agreement under the facts of this action..

## A. Review of the Record

In its preliminary injunction ruling, the Court reviewed the CDC grant program established by Congress and then made the following findings of fact about the Plaintiffs' history of receipt of CDC grants, and the Defendant's recent policy change in awarding such grants:

### 1. Plaintiffs' Grant Awards History[1]

For the past decade, Plaintiffs were awarded CDC grants for the HIV Prevention program. For its most recent performance, in 2011, PPGMR tested over 3,800 individuals for HIV and conducted behavioral interventions with nearly 8,000 individuals. (Docket Entry No. 7, Chase Declaration at ¶ 6; Docket Entry No. 9-6 at 1). PPGMR has a highly successful HIV intervention program for homosexual men, a priority population, and developed a successful syphilis testing strategy for this same group. (Docket Entry No. 9-7, at 4). PPGMR collaborates with over 32 local agencies. (Docket Entry No. 9-7, at 4).

PPMET is one of only three HIV Prevention grantees in the Nashville region and is recognized for its high-quality programming and professional staff. (Docket Entry No. 8, Godwin Declaration at ¶ 6; Docket Entry No. 9-8). PPMET is the primary Nashville-area provider with expertise in working with high-risk youth, including teens who are incarcerated, in state custody, or attending alternative schools. (Docket Entry No. 9-8, at 3). In 2011, PPMET's grant proposal for

---

[1]With minor edits, the following renumbered sections incorporate factual findings in the Court's Memorandum granting Plaintiffs' motion for a preliminary injunction. (Docket Entry No. 2, Memorandum at 3-12).

its HIV Prevention program was to serve 1,250 individuals, but PPMET actually served 2,360. (Docket Entry No. 8, Godwin Declaration at ¶ 6). PPMET provides STD prevention education through relationships with over 100 organizations. (Docket Entry No. 9-8, at 1).

TDOH's evaluations of Plaintiffs' performance under these grants has been consistently positive. (Docket Entry No. 7, Chase Declaration at ¶ 13; Docket Entry No. 8, Godwin Declaration at ¶ 11). Between 2007 and 2011, three senior TDOH officials conducted at least four on-site inspections of PPGMR's HIV program and after each site evaluation, those TDOH officials did not propose any formal recommendations for changes.[2] Following a June 2011 site visit, TDOH's director for HIV Prevention Testing program commended PPGMR's "dedication to HIV prevention and the community" and stated that he "look[ed] forward to working with Planned Parenthood in the future." (Docket Entry No. 9-12).

In 2010 and 2011, UW Nashville conducted six site visits to evaluate PPMET's HIV program and each evaluation was positive. TDOH conducted its evaluation following a December 2010 site visit.[3] UW Nashville's most recent of these favorable evaluations was on December 14, 2011, shortly before the State denied approval for PPMET's participation in the HIV Prevention program. (Docket Entry No. 9-18).

### 2. The 2012 CDC Grants

On May 27, 2011, the Southwest Tennessee RCPG and the Middle Tennessee RCPG issued requests for bids for the 2012 HIV Prevention program. (Docket Entry No. 9-3, at 19; Docket Entry No. 9-4, at 19). On June 29, 2011, PPGMR submitted its detailed proposal for HIV program funding.

---

[2](Docket Entry No. 9, attachment thereto, Exhibits G, H, I and J).

[3](Docket Entry No. 9, Exhibits K, L, M, N, O, P, and Q).

(Docket Entry No. 7, Chase Declaration at ¶ 7; Docket Entry No. 9-6). On June 20, 2011, PPMET submitted its 41-page proposal for an HIV program funding bid. (Docket Entry No. 9-8).

By letter dated August 12, 2011, "[o]n behalf of the State", UW Mid-South notified PPGMR of its approval of PPGMR's 2012 HIV Prevention grant proposal of $73,000. (Docket Entry No. 9-20). August 24, 2011, UW Nashville notified PPMET of its approval of PPMET's 2012 HIV Prevention grant proposal of $41,500 "as approved by the Tennessee Department of Health, HIV/AIDS/STD Section, HIV Prevention Section." (Docket Entry No. 9-21). In September 2011, PPMET and UW Nashville executed a contract for these services. (Docket Entry No. 9-22). PPMET planned to serve at least another 1,100 individuals with its HIV Prevention funds, reaching at least 500 through group level interventions and 600 through its outreach efforts. (Docket Entry No. 8, Godwin Declaration at ¶¶ 7, 13-15). None of these funds would have been used for any abortion-related services. (Docket Entry No.7, Chase Declaration at ¶ 14; Docket Entry No. 8, Godwin Declaration at ¶ 12).

At the State's request, PPGMR also applied for Syphilis Elimination grant funds for 2011 and 2012. During the course of 2011, a TDOH representative approached PPGMR, explaining that its participation was desirable because, among its other qualifications, it is the only subgrantee whose network of community partners includes an agency serving the gay community.[4] (Docket Entry No. 7, Chase Declaration at ¶ 10). By letter dated August 25, 2011, UW of the Mid- South informed

---

[4]Over the past several years, increases in syphilis among homosexual men have been reported in a number of cities. In these recent outbreaks, high rates of HIV co-infection were documented, ranging from 20 percent to 70 percent. CDC, Syphilis & MSM (Men Who Have Sex With Men) -CDC Fact Sheet, available at http://www.cdc.gov/std/syphilis/STDFact-MSM-Syphilis.htm (last visited Feb. I, 2012).

PPGMR of its approval "[o]n behalf of the State"of PPMGR's proposal for Syphilis Elimination funding for 2011 and 2012. (Docket Entry No. 9-23). UW Mid-South and PPGMR subsequently executed a contract for grant funding for October 1, 2011 through December 31, 2011 for $32,000, with a renewal option for the 2012 calendar year. (Docket Entry No. 9-24, at 1, 6). With these Syphilis Elimination funds, PPGMR planned to test and educate close to 2,000 individuals in the Memphis area. (Docket Entry No. 7, Chase Declaration at ¶ 20). With its 2012 HIV Prevention funds, PPGMR anticipated reaching 3,600 people with its HIV testing efforts and over 4,000 with its various education efforts. (Docket Entry No. 7, Chase Declaration at ¶ 7).

### 3. The 2012 Revocations

Plaintiffs received 2012 HIV Prevention and Syphilis Elimination grants in August 2011. Defendant John Dreyzehner became TDOH Commissioner in September 2011. By letter dated December 28, 2011, Jeanece Seals, director of TDOH's HIV/STD Programs, informed UW Mid-South that TDOH would not approve PPGMR as a government subcontractor in the CDC's HIV Services grant program.

> We have reviewed the United Way of the Mid-South's proposed list of subcontractors submitted for the HIV Prevention Services grant contract and are unable to approve Planned Parenthood Greater Memphis Region as a subcontractor. Please notify us as soon as possible if United Way of the Mid-South will propose another subcontractor to provide these services. If another subcontractor is identified, please remember it must be selected through a competitive process and the documentation of the process must be maintained in accordance with Section D.16 of the grant contract.

> If you have any questions about reallocating the unobligated dollars, please contact Melissa Morrison at 615-532-8500, Thank you for your continued support of HIVC prevention programs.

(Docket Entry No. 9-25, Seals Letter).

A PPGMR official contacted a TDOH official about the December 28th letter and was told that the State's refusal to approve Planned Parenthood also included any other State administered grants. (Docket Entry No. 7, Chase Declaration, at.¶ 12). On January 9, 2012, after the 2012 grant funding was to commence, Niki Easley, UW Nashville's senior manager for HIV/AIDS Initiatives, informed Jeff Teague, of PPMET that TDOH would not approve its participation in the grant program. (Docket Entry No. 9-26). In a subsequent telephone call with PPMET, a TDOH representative intimated that PPMET was unlikely to receive any grant funds during Defendant's tenure as Commissioner. (Docket Entry No. 8, Godwin Declaration at ¶ 10).

Plaintiffs were the only service providers among the successful bidders that TDOH did not approve. In correspondence with PPGMR, a TDOH official confirmed this, stating that "[a]ll other contracts for HIV prevention were allowed to continue across the state, except for the two Planned Parenthood subcontracts." (Docket Entry No. 7, Chase Declaration at ¶ 12). This TDOH official observed: "I do not believe that experience and skill factored into the decision, as this information was not included as part of the contract that was sent for [C]onmissioner approval." Id. A TDOH representative subsequently informed the 2012 HIV Prevention grantees of continued HIV testing and counseling training from PPGMR, but that grant funds could not be used for this purpose and PGGMR had to charge a fee for such services. Id. at ¶¶ 16-17. TDOH reserved funds to reimburse the grantees for any fees paid to PPGMR. Id.

According to Melissa Morrison, TDOH's Director of the HIV/STD Prevention programs, she manages the HIV Prevention Program and the STD Prevention program, including Federal grants

for both programs. (Docket Entry No. 28, Morrison Declaration at 1). After Dreyzehner's December 2011 decision not to approve PPGMR and PPMET, Jeanece Seals, Laurie Anderson, and Morrison sought replacement subgrantees and to reallocate the $73,000 in HIV Prevention funds in Memphis, the $41,500 in HIV Prevention funds in Nashville, and the $57,000 in Syphilis Elimination funds in Memphis that had been preliminarily allocated to PPGMR and PPMET. Id. at 2.

UW Memphis and UW Nashville assisted Morrison in issuing "mini" Requests For Proposals ("RFPs") to existing agencies that were chosen for funding in their other areas. "Mini" RFPs were circulated to Friends For Life ("FFL"), PEAS Inc. (Partnership to End Aids Status Inc.), Le Bonheur Community HIV Network, University of Memphis (Job Corp program), South Memphis Alliance, Children and Family Services, and St. Andrew AME Church. Id. Of those seven (7), six (6) agencies applied. Id. PEAS was accepted to place 200 high-risk heterosexuals through the VOICES program and 125 through the RESPECT program, as well as 60 gay men through a new program, "Many Men, Many Voices." Id. at 3. PEAS would begin a Rapid Testing program to serve 325 individuals. Id. at 3. PEAS's total grant was $61,000. Id. FFL was awarded $12,000 to implement the Cuidate! Program to reach 25 high-risk Hispanic youth. Id. In Nashville, HIV Prevention grants were awarded to Street Works, Nashville CARES and First Response Center. A $41,500 grant was awarded to First Response Center to implement the Street Smart DEBI Intervention to reach 200 youth. Id. First Response had memorandum of understanding with high-risk youth in populations not previously provided HIV evidence-based interventions. Id. These sub-contracts were to begin on February 1, 2012. Id. at 4. FFL in Memphis received the $57,000 in Syphilis Elimination through the CDC grant that had been designated for PPGMR. Id. FFL will increase its media campaign in Memphis for African-American men who have sex with men and will test an additional

8

500 men. Id.

HIV Prevention program and Syphilis Elimination program grantees submit invoices on a monthly basis to the Lead Agency, UW, that submits its monthly invoices to TDOH. Aside from CDC HIV Prevention grants, TDOH provides approximately 4,000 HIV Prevention rapid test kits annually to PPGMR for both clinical and outreach testing, and plans to continue to do so. Id. Each kit costs the Department of Health approximately $10.50. Id. at 4-5. Yet, TDOH does not provide funding for testing personnel through its CDC HIV Prevention grants, to Planned Parenthood nor to any other recipient. Id. at 5.

According to Morrison, "PPGMR conducts at least four (4) [HIV tetsing] trainings per year in Memphis, and is the only certified master trainer in Memphis capable of doing such extensive training." Id. After PPGMR's non-approval as a subgrantee in 2012, the $100 fee per person that PPGMR now intends to charge for its HIV Testing training may be paid from UW Memphis's $6,000 training fund. Id. Morrison denies telling Ms. Godwin that "it would not be worth PPMET's time and resources to apply for future grant funding while Commissioner Dreyzehner is in office." Id. Morrison states that "I told them that was up to them, given the political climate." Id.

### 4. Political and Legislative History[5]

---

[5]For the relevance of this section, see Planned Parenthood of Kansas and Mid-Missouri v. Brownback, 799 F. Supp.2d 1218, 1229-30 (D. Kan. 2011):

> Given the obvious conflict between state and federal law, the court would be remiss in ignoring the legislative history cited by the plaintiff. Further, it is important to stress that plaintiff's claim includes the allegation that Section 107(l) was passed for an improper purpose, that of punishing Planned Parenthood for its association with abortion. The court accordingly considers the contemporaneous floor statements of the author of the challenged legislation as highly probative of legislative intent.

Plaintiffs cite now Governor Haslam's 2010 campaign platform pledge to prevent public monies from being directed to Planned Parenthood.[6] According to Plaintiffs, in 2011, with Governor Haslam's support, the Tennessee General Assembly amended the appropriations bill upon request of State Senator Stacey Campfield. Senator Campfield's amendment limited Title X grant funds to government health agencies, thereby excluding private, not-for-profit organizations, such as Planned Parenthood.[7] With the adoption of his amendment and enactment of the appropriation bill for fiscal year 2012, Senator Campfield stated: "We had to kiss a lot of ugly girls at the prom, but we took the pretty one home. . . . [W]e got what I was looking for, which was defunding Planned Parenthood. . . ." (Docket Entry No. 9-27, at 2).[8]

Plaintiffs also cite Ron Ramsey, Tennessee's Lieutenant Governor, who issued a June 10, 2011 press release praising "the work of Gov. Bill Haslam and the Tennessee Department of Health

---

[6]Tennessee Governor's Race, Viewpoint, *Memphis Commercial Appeal*, Apr. 11, 2010, <u>available at</u> 2010 WLNR 7565407 <u>also</u> <u>available at</u> http://services.tennessean.com/news.aspx/2010-tn-governor-race (follow "Bill Haslam" hyperlink; then follow "Social Issues" hyperlink) (last visited Feb. 1, 2012).

[7]The budget amendment, designated as Section 78 of the appropriations bill, TENN. PUB. ACT, Ch. 473 (2011) provides:

Title X family planning funds appropriated to the department of health shall be used fully in Title X programs operated by state, county or municipal health agencies and staffed by employees of such agencies and no Title X family planning funds shall be paid to third-party providers or private organizations or entities.

The Court deems an interesting issue is whether the State's right of speech extends to limit the distribution of federal funds. Unquestionably, under <u>Rust v. Sullivan</u>, 500 U.S. 173 (1991), the State may exercise its right of speech to state funds. Because the parties' did not brief this issue, the Court will not address this issue. Similarly, this issue was not raised in the Fifth Circuits decision in <u>Planned Parenthood Assoc. of Hidalgo County Texas, Inc. v. Suehs</u>, 692 F.3d 343 (5th Cir. 2012).

[8]Tom Humphrey, Budget bill mix-up in Nashville remains unresolved, Knoxville News_Sentinel, June 12, 2011, <u>available at</u> 2011 WLNR 11711216, <u>also</u> <u>available at</u> http://blogs.knoxnews.com/humphrey/2011/06/with-planned-parenthood-defund.html (Docket Entry No. 9-27).

for moving to administratively defund Planned Parenthood."[9] Ramsey also asserted that "Planned Parenthood is the largest abortion provider in the country." Ramsey also cited that Davidson County was ending its Title X contract with PPMET, and that Shelby County expected to begin closure of its similar contract with PPGMR. Ramsey stated: "It has always been the ambition of Republicans in the legislature to defund this organization. I was proud to lead the charge to turn over famiiy planning services to the county health departments effectively defunding the organization in 93 out of 95 counties. I'd like to praise the Governor for working to completely turn off the spigot of taxpayer funds to Planned Parenthood." (Docket Entry No. 9-28).

According to Plaintiffs, similar Congressional efforts are underway to defund Planned Parenthood for its association with and provision of abortion services. On February 17, 2011, United States Representative Mike Pence proposed an amendment to a federal appropriations bill that the House of Representative adopted that singled out Planned Parenthood and its 102 putative affiliates from receiving federal funds for any purpose. Representative Pence explained his amendment as necessary because Planned Parenthood "provide[s] and promote[s] abortion." 157 Cong. Rec. H1081-01, 2011 WL 556799, at *H1157 (statement of Rep. Pence). In addition to Tennessee, Plaintiffs cite efforts in 2011 in Kansas, Indiana, New Hampshire, North Carolina, Texas, and Wisconsin to defund abortion providers and Planned Parenthood specifically. (Docket Entry No. 29, Memorandum at 4-12).

On February 17, 2012, the Court entered a preliminary injunction in this action. Under which the Court

---

[9]Tennessee Lt. Governor Ramsey, http://ltgov. tn.gov/2011/06/ (follow "Lt. Governor Ramsey praises Governor . . ." hyperlink) (Docket Entry No. 9-28).

> **ORDERED** that Defendant, his agents, employees and successors are preliminarily **ENJOINED**: (1) from continuing Plaintiffs' disqualification from receiving HIV Prevention and Syphilis Elimination subgrants for the reasons stated in the Court's ruling and Memorandum; and (2) from directing United Way to act in a manner inconsistent with the above.

(Docket Entry No. 30) (emphasis in original).

On March 30, 2012, the Court held a Case Management Conference, but did not enter a Case Management Order because the parties informed the Court that they were attempting to resolve this action through settlement negotiations. On April 3, 2012, the parties submitted a proposed order to that effect, (Docket Entry No. 37), requesting thirty days to resolve the action through such negotiations. On April 4, 2012, the Court entered an Order (Docket Entry No. 38) recognizing the parties' ongoing negotiations and requiring the parties to file a report on their discussions by April 30, 2012.

On April 25, 2012, Plaintiffs proposed specific language for a permanent injunction and suggested that the parties agree to the injunction prior to negotiating fees and costs. (Docket Entry No. 48-1, Danos Declaration at 2). In response to Plaintiffs' proposed language, Defendant's counsel proposed the following:

> I don't yet have full client authority, John. But my sense is that agreed-upon injunctive language that would five the Department of Health sufficient contracting flexibility, coupled with a waiver or significant reduction of Section 1988 attorneys' fees and costs, would have a good chance of flying. What do you think? Can you suggest anything specific?

(Docket Entry No. 55-1).

Plaintiffs' counsel responded, proposing the preliminary injunction be converted into a permanent injunction, stating:

> I propose that we try to work out the injunction language first. We can discuss the

12

fees and the costs once we have an agreement on the injunction.

> If that sounds like a plan, and if [we] can get close on the injunction language, I also propose that we file a joint report on Monday letting Judge Haynes generally know where we stand and propose that we report back in two or three weeks to allow for a bit more time to work out any remaining issues.

Id. (alteration added). Defendant's counsel agreed, stating "I think your ideas for proceeding are good ones." Id.

In their April 30, 2012 Joint Case Management Report (Docket Entry No. 39), the parties reported the following:

> In the past 30 days, counsel for the parties have agreed to a framework for their discussions and are reviewing drafts of possible permanent injunction language. While the parties have yet to reach a final agreement, they believe that they can still do so within a limited additional period of time. The parties requested an additional three weeks for their negotiations. On May 1, 2012, the Court granted that request.

(Docket Entry No. 40).

On May 18, 2012, Defendant proposed his language for a permanent injunction language. (Docket Entry No. 48-1, Danos Declaration at 5). On May 22, 2012, Plaintiffs responded and on May 24, 2012, the parties agreed to a permanent injunction. (Docket Entry No. 48-1, Danos Declaration at 9, 14). On May 24th, the parties filed a report with the Court on their settlement agreement. (Docket Entry No. 41). The parties reported:

> **The parties have agreed to a permanent injunction** but continue to negotiate the issue of attorneys' fees, costs and expenses pursuant to 42 U.S.C. § 1988. In light of the agreement on an injunction and the productive nature of the discussions to date, the parties request another month to attempt to resolve the remaining issue. The parties propose that, if they have no reached an agreement by June 25, 2012, then they shall file another report with the Court to update the Court on the progress of their discussion and also indicate whether an order requiring formal ADR is appropriate and propose a case management order, if appropriate.

Id. (emphasis added). Consistent with the parties framework and as described in their earlier report

to the Court, the permanent injunction settled all substantive claims in this action. At that point, the sole remaining issue in the action was attorneys' fees and costs.

The parties then entered into negotiations regarding fees and costs. On July 11, 2012, Plaintiffs provided Defendant with a total of their fees adjusted to local rates and costs. ((Docket Entry No. 48-1, Danos Declaration at 23). In the communication with Defendant's counsel, Plaintiffs' counsel stated, "[b]elow is our calculation of what we think is due, but we invite you to make a settlement offer rather than going through the time and added expense of a fee petition." Id.

In response, Defendant requested additional information from Plaintiffs on their fees and costs. Plaintiffs next provided a further breakdown of fees and costs on July 24, 2012. On August 22 and 27, 2012, Plaintiffs provided detailed billing statements. Thereafter, the Defendant never made an offer on attorneys' fees and costs.

On October 22, 2012, Defendant filed a progress report with a copy of the the Fifth Circuit's decision in Planned Parenthood Assoc. of Hidalgo County Texas, Inc. v. Suehs, 692 F.3d 343 (5th Cir. 2012).[10] The Defendant advised the Court of his rejection of an agreed permanent injunction in the action.

At a November 5, 2012 status conference, the Defendant notified the Court that he would no longer agree to a permanent injunction previously presented to the Court in conjunction with a settlement agreement. The Court instructed the parties to file briefs on whether an enforceable

---

[10]In Suehs, the Fifth Circuit vacated the preliminary injunction that was issued by the district court, holding that the trial court erred in concluding that a Texas state regulation that had the effect of excluding the Planned Parenthood providers from providing their services through Texas Women's Health Program because of their relationship with entities that performed or promoted elective abortions violated the First Amendment.

settlement agreement was reached in this action.

## B. Conclusions of Law

### 1. The Settlement Agreement

In the Sixth Circuit, "[s]ettlement agreements are a type of contract and are therefore governed by contract law. Thus, "[w]hether [a settlement agreement] is a valid contract between the parties is determined by reference to state substantive law governing contracts generally." Bamerilease Capital Corp. v. Nearburg, 958 F.2d 150, 152 (6th Cir. 1992) (alterations added). Under Tennessee law, "[w]hile a contract may be either expressed or implied, or written or oral, it must result from a meeting of the minds of the parties in mutual assent to the terms, must be based on sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced." Higgins v. Oil, Chem. & Atomic Workers Union, 811 S.W.2d 875, 879 (Tenn. 1991).

Moreover, under Tennessee law, where the terms of the settlement have been announced to the Court or memorialized in a signed, enforceable contract, the courts may enforce the agreement. See In re Estate of Creswell, 238 S.W.3d 263, 268 (Tenn. Ct. App. 2007). A settlement agreement that the parties' counsel announced in open court is enforceable where "all the essential terms [have] been agreed upon in open court and all that remain[s] [is] to sort out the non-material details and put the agreement in writing." RE/MAX Int'l, Inc. v. Realty One, Inc., 271 F.3d 633, 646 (6th Cir. 2001). Thus, here, the principal inquiry is whether all "essential terms" of the settlement were agreed upon at the time the parties reported their settlement agreement on the permanent injunction to the Court.

In Graley v. Yellow Freight Sys., 221 F.3d 1334, 2000 WL 799779 (6th Cir. June 14, 2000),

the Sixth Circuit addressed whether an enforceable settlement agreement arose in similar circumstances as here. In Graley, the Sixth Circuit affirmed a district court's enforcement of a settlement agreement that the parties reached immediately prior to an injunction motion. Id. at *1. In Graley, immediately prior to a hearing on injunctive relief, Plaintiff's counsel announced "we have reached a settlement agreement. . . . We expect to culminate and finalize everything with a week to completely resolve the matter." Id. The district court in Graley construed the intent of the parties, and enforced the settlement agreement, after reviewing the handwritten terms of the agreement that had been reviewed by counsel for each party to the suit. Id. at 2.

Here, the Court considers the emails exchanged by each party's counsel to assess the parties' intent. Following weeks of negotiation, the following emails were exchanged, in pertinent part, between counsel for each party:

**[Plaintiffs' counsel to Defendant's counsel, May 24, 2011 5:36 PM (CST)]:**

We have agreement on the injunction language – taking out RCPG and only using lead agency:

"Defendant and his successors, and employees or agents acting under the control or direction of defendant's office are ENJOINED: (1) from disqualifying Plaintiffs from receiving HIV Prevention and Syphilis Elimination subgrants for which they are otherwise eligible because of Plaintiffs' advocacy for access to, association with, or provision of abortion service; and (2) from directing any of the lead agencies with respect to the subgrants from acting in a manner inconsistent with the above."

**[Defendant's counsel to Plaintiffs' counsel, May 24, 2011 6:06 PM (CST)]:**

John, all looks good. Thank you!

(Docket Entry No. 48-1, Exhibit 4).

Here, the plain language of the parties' emails presents clear evidence that the parties had a meeting of the minds and reached a settlement agreement on a permanent injunction. This

settlement agreement resolved all substantive claims in this action. The sole remaining issue was Plaintiffs' attorneys' fees and costs. Defendant contends the "but" in the May 24th case management report constitutes clear evidence that a material issue had yet to be agreed upon by the parties:

> [t]he parties have agreed to permanent injunction **but** continue to negotiate the issue of attorneys' fees, costs and expenses pursuant to 42 U.S.C. § 1988. In light of the agreement on an injunction and the productive nature of the discussions to date, the parties request another month to attempt to resolve the remaining issues.

(Docket Entry No. 41, Parties' Report to the Court) (emphasis added).

Based upon this language, Defendant asserts that the "settlement agreement" presented to the Court was incomplete absent an agreement on attorneys' fees and costs. The "but" to which Defendant refers is Defendant's only proof for his position that any agreement was contingent on settlement of fees and costs. Defendant also attempts to distinguish this action from Graley insofar as the parties in this action did not inform the Court that their settlement agreement would "resolve[] the entire case," as the parties did in Graley. Graley, WL 799799 at *4. Yet, here, as in Graley, the parties presented the Court with a settlement agreement that had agreed upon all material and essential terms.

In a recent decision, Northeast Ohio Coalition for the Homeless v. Secretary of State of Ohio, 695 F.3d 563 (6th Cir. 2013), the Sixth Circuit addressed the issue of attorney fee and an enforceable settlement agreement.

> The Civil Rights Attorney's Fees Award Act (the "Fees Act"), 42 U.S.C. § 1988(b), "permits a court in its discretion to award the 'prevailing party' in a § 1983 action 'reasonable' attorney's fees as part of the costs." Pouillon v. Little, 326 F.3d 713, 716 (6th Cir.2003). The Fees Act does not "bestow[ ] fee awards upon attorneys nor render[ ] them nonwaivable or nonnegotiable. . . ." Evans v. Jeff D., 475 U.S. 717, 731–32, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986). Thus, a prevailing plaintiff may waive attorney's fees as part of a negotiated settlement. See id. at 732–37, 106 S.Ct. 1531. In considering whether a settlement includes a release or waiver of a claim to fees under 42 U.S.C. § 1988, we have adopted an approach

that does not require the parties to reach an explicit agreement on the issue of attorneys' fees. McCuiston v. Hoffa, 202 Fed.Appx. 858, 863 (6th Cir.2006) (citing Jennings v. Metro. Gov't of Nashville, 715 F.2d 1111, 1114 (6th Cir.1983)). Instead, **the critical inquiry is "whether the parties intended the settlement to be a final disposition of all claims, rather than whether the parties intended to include attorneys' fees in the settlement." Jennings, 715 F.2d at 1114. Because the parties need not have entered into "a separate agreement on each aspect of the claim in order to have reached a settlement in full," in conducting the inquiry, "the silence of the parties regarding attorneys' fees is not controlling." Id. Although intent is generally a question of fact, "it may be determined by the court when the record permits only one inference."** McCuiston, 202 Fed.Appx. at 865 (citing Jennings, 715 F.2d at 1114).

Id. at 569. (emphasis added). See also Reed v. Wehrmann, 159 F.Supp.2d 700, 705 (S.D. Ohio 2001) (referring any request for attorneys' fees under 42 U.S.C. § 1988 as a "collateral matter" that "is addressed only after a plaintiff is determined to be the 'prevailing party.'").

Moreover, here the parties agreed to the entry of a permanent injunction that requires the entry of an agreed order or consent decree. In Buckhannon Bd. & Care Home Inc. v. West Virginia Dept. Of Health and Human Servs., 532 U.S. 598, 604 (2001), the Supreme Court stated that "settlement agreement enforced through a consent decree may serve as the basis for an award of attorney's fees" because such an agreement alters the relationship of the parties. Thus, by agreeing to the entry of a permanent injunction, as a matter of law, Plaintiffs are entitled to consideration of an award of their attorney fees.

The crux of the inquiry here rests upon whether all "essential terms" had been agreed upon by the parties. Here, the parties' settlement agreement regarding the permanent injunction resolved all substantive claims. Given the plain language of the case management report and the email exchanges, the Court concludes that the parties' report of settlement that was presented in open court constitutes an enforceable settlement agreement. Thus, the Court concludes this agreement for a

permanent injunction resolved all legal claims in this action and thus, constituted a binding contract. Given that the resolution of issues pertaining to attorneys' fees and costs had no bearing on the substantive matters in this action, the Court concludes that attorneys' fees and costs are collateral matters in this action. The Court further concludes the settlement agreement was not contingent on any settlement of fees and costs.

Moreover, the Defendant agreed to negotiate attorneys' fees, but did not do so. Tennessee "common law imposes a duty of good faith in the performance of contracts." Wallace v. Nat. Bank of Commerce, 938 S.W.2d 684, 686 (Tenn. 1996). The scope of the duty of good faith and fair dealing "depends upon the individual contract in each case. In construing contracts, courts look to the language of the instrument and to the intention of the parties, and impose a construction which is fair and reasonable." Id. (citation omitted). "Bad faith performance occurs precisely when discretion is used to recapture opportunities foregone upon contracting." Steven J. Burton, Breach of Contract and the Common Law Duty to Perform in Good Faith, 94 HARV. L. REV. 369, 373 (1980) (emphasis added) (hereinafter cited as "Burton"). Moreover, "[g]ood faith performance, in turn, occurs when a party's discretion is exercised for any purpose within the reasonable contemplation of the parties at the time of formation." Id.

Here, the parties' case management report to the Court clearly reflects that the parties agreed to negotiate the amount of Plaintiffs' attorney fees and costs. Plaintiffs provided a detailed statement of their attorneys fees and costs. At the Defendant's request, Plaintiffs provided supplemental information on these fees and costs. Yet, the Defendant never responded to Plaintiffs' counsel's request to make an offer on the resolution of the amount of Plaintiffs' fees and costs. The Defendant never responded despite his agreement to negotiate these issues. Instead, the Defendant attempts to

19

withdraw from his negotiated agreement on the permanent injunction months after negotiations on that issue closed. Such an attempt exemplifies a party attempting to "recapture opportunities foregone upon contracting." Id.

For these reasons, the Court concludes that the parties reached an enforceable settlement agreement for a permanent injunction. The Defendant rendered the agreed negotiation on attorneys' fees and costs futile by refusing to negotiate. In these circumstances, the Court concludes that the parties had a binding settlement agreement on the permanent injunction that resolve all substantive claims. Thus, the Plaintiffs' motion for a permanent injunction should be granted.

## 2. The Fifth Circuit Decision

To justify his position, the Defendant argues that since the parties' settlement discussions, a Fifth Circuit issued its decision in Planned Parenthood Assoc. of Hidalgo Cnty. Texas, Inc. v. Suehs, 692 F.3d 343 (5th Cir. 2012) that supports the Defendant's original position. Defendant contends that this change in the law warrants setting aside the parties' prior settlement discussions. With its ruling that the parties entered into an enforceable settlement agreement, the Court addresses whether the Fifth Circuit's decision justifies setting aside the parties' settlement agreement.[11]

Under Buckhannon, the parties' agreement for entry of a permanent injunction requires entry of a court order and alters the parties' relationship. 532 U. S. 598, 604 n.7. "[A] consent decree is a 'settlement agreement subject to continued judicial policing.'" Vanguards of Cleveland v. Cleveland, 23 F.3d 1013, 1017 (6th Cir. 1994). "Judicial approval of a settlement agreement places the power and prestige of the court behind the compromise struck by the parties." Williams v.

---

[11]As discussed in the authorities, supra, to evaluate this justification under the relevant law requires an enforceable agreement.

<u>Vukovich</u>, 720 F.2d 909, 920 (6th Cir. 1983). As such, settlement agreements, like consent decrees, are "entitled to a presumption of finality." <u>United States v. State of Michigan</u>, 940 F.2d 143, 150 (6th Cir. 1991).

In addressing the issue of modifying a settlement agreement, the Court examines decisional law regarding modification of consent decrees for guidance. "A consent decree . . . should be strictly construed to preserve the bargained for position of the parties." <u>Vanguards of Cleveland</u>, 23 F.3d at 1017 (citation omitted). Thus, the Court is guided by an obligation to preserve the position for which the parties bargained when they entered into the agreement regarding the permanent injunction.

Yet, the Supreme Court, in <u>Rufo v. Inmates of Suffolk County Jail</u>, 502 U.S. 367 (1992), adopted a "flexible standard" for modification of a consent decree. "[A] party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revisions of the decree." <u>Id.</u> at 383. If the moving party meets this standard, the Court should next consider "whether the proposed modification is suitably tailored to the changed circumstance." <u>Id.</u>

Under <u>Rufo</u>, the moving party can satisfy its burden of proof of "a significant change either in factual conditions or in law," by persuasive proof that the decree proves to be "unworkable because of unforeseen obstacles." 502 U.S. at 384. "Ordinarily, however, modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." <u>Id.</u> at 385. In such circumstances, the moving party "would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)" of the Federal Rules of Civil Procedure. <u>Id.</u> In essence, "a consent decree is a final judgment that may be reopened only to the

extent that equity requires." Id. at 391. If the moving party demonstrates a significant change in factual circumstances or law, the court must next consider "whether the proposed modification is tailored to resolve the problems created by the change in circumstances." Id. at 391.

The Sixth Circuit reiterated the procedural requirements for a district court that is faced with a proposed modification to a consent decree:

> Recognizing the significance of modifying the terms of a consent decree over the objection of one of the parties, this Court has required district courts to hold "a complete hearing" and to make appropriate findings of fact before making such modifications. Vanguards of Cleveland v. City of Cleveland, 23 F.3d 1013, 1017 (6th Cir. 1994); see also Gonzales v. Galvin, 151 F.3d 526, 535 (6th Cir. 1998) (noting that "a 'complete hearing' of an issue does not necessarily require a full-blown evidentiary hearing").

> That a formal hearing should be held before a court alters a consent decree, however, does not mean that a court must hold a formal hearing before it refuses to modify a consent decree. When a motion does not raise a serious challenge to the consent decree and merely appears to be "a post-judgment attempt by a party to escape from obligations it had voluntarily assumed," Del. Valley Citizens' Council for Clear Air. v. Pennsylvania, 674 F.2d 976, 981 (3d Cir. 1982), it may well be appropriate for a trial court to reject the motion without holding a formal hearing.

United States v.Wayne County, Michigan, 369 F.3d 508, 512 (6th Cir. 2004).

Here, there are not any change in factual circumstances. Only a legal change occurred that is attributed to the Fifth Circuit's ruling in Suehs. The Court has been fully briefed on this legal issue by the parties. Moreover, "[s]ummary enforcement of a settlement agreement, without holding an evidentiary hearing, is proper when the parties do not dispute material facts pertaining to the existence or the terms of a settlement agreement." Graley v. Yellow Freight Sys., 221 F.3d 1334, 2000 WL 799779 at *4. Thus, the Court concludes an evidentiary hearing is unnecessary.

As to whether a significant change in law occurred requiring the modification of the settlement agreement, in Suehs, the district court preliminarily enjoined the enforcement of the Texas

statutes and regulations barring the award of funds to entities that provided or were affiliated with entities that provided abortion services. The district court concluded that the Texas laws violated the Plaintiffs constitutional rights to free speech and association, as well as deny Plaintiffs' equal protection rights. Id.

The Fifth Circuit vacated and remanded the district court's ruling, holding the district court erred for "insufficient attention to Texas's authority to subsidize speech of its choosing within its programs." Id. The Fifth Circuit noted that in 2005, the Texas Legislature created the Women's Health Program ("WHP"), a program funded both federal and state government, to expand access to women's health services. Id. Since WHP's inception, the Texas legislature prohibited the regulatory agency that administers WHP, from contracting with "entities that perform or promote elective abortions or are affiliates of entities that perform or promote elective abortions. Id. (citing § 1(h), 2005 Tex. Gen. Laws at 2818). From 2005 to 2011, however, this state agency paid the Suehs plaintiffs for their provision of WHP service, despite plaintiffs' engagement in abortion advocacy and their legal relationship with Planned Parenthood Federal of America.

Yet, in 2011, when the Texas legislature re-authorized WHP, the state agency promulgated regulations interpreting WHP's restriction on abortion-related activity in which the regulating state agency expressly defined "promote" as to "[a]dvocate[] or popularize[] by, for example, advertizing or publicity." These regulations further defined "affiliate" as:

> (A) An individual or entity that has a legal relationship with another entity, which relationship is created or governed by at least one written instrument that demonstrates:
>
> (i) common ownership, management, or control;
>
> (ii) a franchise; or

(iii) the granting or extension of a license or other agreement that authorizes the affiliate to use the other entity's brand name, trademark, service mark, or other registered identification mark.

Id. at 347. This state agency mandated that recipients of WHP funds certify their compliance with the new regulations. Id. Believing compliance to be impossible, plaintiffs brought an action against state agency's commissioner. Id.

In reversing the district court's ruling, the Fifth Circuit stated that under the "unconstitutional conditions doctrine," the First Amendment prohibits both direct burdens on speech, and indirect burdens that are created when the government conditions receipt of a benefit on foregoing constitutionally-protected speech. Id. at 348-49. The Fifth Circuit explained that the unconstitutional conditions doctrine analysis is unnecessary where under Rust v. Sullivan, 500 U.S. 173, 196 (1991) the State can impose its funding condition directly.Id. at 349. The Fifth Circuit stated that, "if the government could directly achieve the result in question, then it is unnecessary to assess the result within the unclear framework of the unconstitutional conditions doctrine." Id. The Fifth Circuit concluded that while the restriction on promoting elective abortions functions was a speech-based funding condition, the restriction is constitutional under Rust. Id. at 349.

As to the Texas requirement that would deny State funds to entities that utilized symbols associated with abortion, the Fifth Circuit held that Texas may deny WHP funds from organizations that promote elective abortions through identifying marks "because this restriction is lawful as a direct regulation of speech." Id. at 351.

As to the Texas regulation barring participation based upon Plaintiffs' affiliation with abortion provider, the Fifth Circuit noted : " Because the legal principles applicable to promotion and affiliation differ, it is important to assess these restrictions separately." Id. at 349. Significantly, on

that part of the Texas regulatory scheme barring contracts with any entity "affiliated" with another entity that provided abortion services, the Fifth Circuit noted that "the regulations' restriction on affiliation is problematic because it is not a direct regulation of the content of a government program." Id. The Fifth Circuit, however, remanded the action without deciding the constitutionalty of the restriction on affiliation. As discussed below, Suehs actually supports enforcement of the settlement agreement on the permanent injunction.

The Court concludes that Suehs is distinguishable from the facts of this action and the relevant law. Here, the Defendant sought to defund these Planned Parenthood organizations whose bids for services had been accepted "on behalf of the State". Supra at p. 5.. Second, unlike Suehs the services here do not involve abortion services. As the Court found previously, the legislative history of this state law directing the Defendant's acts reveals a clear executive and legislative intention directed at Plaintiffs' speech and association. (Docket Entry No. 29, at 10-12). Thus, the only basis for the Defendant's revocation of the Plaintiffs' successful bids is the Plaintiffs' affiliation with abortion services. The Defendant's decisions to defund Plaintiffs, as providers of services related to sexually transmitted diseases, are based upon their views outside of the services Plaintiffs agreed to provide for the State and as discussed below is prohibited by Rust. 500 U.S. at 195. As the Court concluded earlier on the preliminary injunction motion ruling,

> Under the First Amendment, "[a] State may not condition public employment on an employee's exercise of his or her First Amendment rights." O'Hare Truck Service
> , Inc.v. City of Northlake, 518 U.S. 712, 717 (1996). In O'Hare, where a government contractor "was targeted with a specific demand for political support" and whose refusal of that demand resulted in his removal as a City contractor, the Supreme Court extended this First Amendmnt protection to the government contractor, stating: "We see nothing to distinguish this from the coercion exercised in our other unconstitutional conditions cases." Id. at 721. In a companion decision, Bd. of County. Comm'rs v. Umbehr, 518 U.S. 668, 674-75, 680 (1996), involving the government cancellation of an independent contractor's a pre-existing commercial

contract as punishment for the contractor's exercise of constitutional rights, the Supreme Court stated: "The First Amendment permits neither the firing of janitors nor the discriminatory pricing of state lottery tickets based on the government's disagreement with certain political expression." Id. at 680.

The rationale is that "if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited ... allow[ing] the government to 'produce a result which [it] could not command directly.'" Perry v. Sindermann, 408 U.S. 593, 597 (1972) (quoting Speiser v. Randall, 357 U.S. 513, 526 (1958)); see also Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 587 (1998) ("If the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints, then we would confront a different case."); Lane v. City of Lafollette, 490 F.3d 410, 419 (6th Cir. 2007) ("the denial of a government benefit on account of a person's political beliefs is in effect a penalty for holding those beliefs." (citing Perry, 408 U.S. at 597).

**In Rust v. Sullivan, 500 U.S. 173, 196 (1991), where the plaintiffs asserted their First Amendment right "to engage in abortion advocacy and counseling," the Supreme Court explained that "our 'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally approved program." Id. at 197 (emphasis in original). In Rust, the Supreme Court recognized that although the government can elect not to subsidize the abortion or advocacy for access to abortion as a form of government speech, the government cannot disqualify an otherwise eligible recipient of public funds based on that recipient's conduct outside of the government program. Id. at 198.**

Circuit and district courts have held in the context of abortion advocacy groups, that the First Amendment rights of expression, association and advocacy are violated where States target abortion groups for disqualification from public funding. Planned Parenthood of Mid-Mo. & E. Kan., Inc. v. Dempsey, 167 F.3d 458, 462 (8th Cir. 1999) ("Legislation that simply dictates the proper scope of government-funded programs is constitutional, while legislation that restricts protected grantee activities outside government programs is unconstitutional .... "); Planned Parenthood of Cent. N.C. v. Cansler, 804 F. Supp.2d 482 (M.D.N.C. 2011) (North Carolina prohibition on Planned Parenthood receiving Title X as well as certain state funds constituted impermissible penalty).

In a recent decision, the District Court for North Carolina observed that "[W]hile a state may completely choose not to fund abortion services, the state may not bar an

entity from the benefit of funding for which it would otherwise be eligible based on the entity's participation in unrelated 'legal and constitutionally-protected conduct.'" Cansler, 804 F. Supp. 2d at 494 (quoting Planned Parenthood of Kan. & Mid-Mo. v. Brownback, 799 F. Supp. 2d 1218, 1234 (D. Kan. 2011) (granting an injunction against a Kansas law as an impermissible penalty on exercise of constitutional rights where "the circumstances surrounding the passage of [the defunding law] convince the court that the purpose of the statute was to single out , punish, and exclude Planned parenthood, the only historical Kansas subgrantee which provides and associates with a provider of abortion services from receiving any further Title X grants.")).

The Court concludes from the proof here that based upon Plaintiffs' historical experiences in providing these services under State awarded grants for almost a decade and the State's agent's provisional awards of Title X grants to Plaintiffs for 2012 grants, the Defendant's rejection of Plaintiffs was based upon their First Amendment activity for advocating abortion. The Defendant's disapproval of Plaintiffs' grant awards is to penalize Plaintiffs for the exercise of their constitutionally-protected right of affiliation with, and/or advocacy for access to abortion services. Because this penalty on constitutionally-protected activity violates Plaintiffs' rights under the First Amendment, Plaintiffs are substantially likely to succeed on the merits of these claims.

(Docket Entry No. 29) (emphasis added).

Based upon these Supreme Court precedents cited in the Court's earlier ruling of the preliminary injunction, the Court concludes that there has not been a change in the law to justify any alteration of the parties' settlement agreement on the permanent injunction. The Court also respectfully disagrees that the Fifth Circuit decision in Suehs applies here and to the extent Suehs applies, its statements about the constitutionality of the state regulation on affiliation actually supports the parties' settlement agreement and the Court's prior ruling.

## C. Conclusion

For these reasons, the Court concludes that Plaintiffs' motion to enforce the settlement agreement for a permanent injunction should be granted. Any request for costs and attorneys' fees will be considered in accordance with Local Rule 54.01.

An appropriate Order is filed herewith.

**ENTERED** this _13th_ day of March, 2013.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court.